# BLYTH ET AL. v. PINKERTON NATIONAL DE- TECTIVE AGENCY.

### GUARANTY—EVIDENCE.

1. A written guaranty to pay for services to be rendered by a detective agency in a murder case was executed by defendants. No time was fixed on its face to run, nor an aggregate amount of liability. An accused was tried and convicted, the agency paid for their services, and their further services dispensed with. A new trial having been granted, the agency rendered other services, upon the request of an attorney specially employed in the prosecution by one of the defendants, but no additional guaranty was executed. In a suit for the subsequent services against the parties signing the aforesaid guaranty, *Held,* that the guaranty was not a continuing one, and defendants were not liable thereunder for the services subsequently rendered.

2. The guaranty not being a continuing one, to rebut the theory that one of the defendants had authorized or ratified the subsequent employment by his acts, it was competent for said defendant to introduce in evidence a letter to him from said attorney, who had engaged the subsequent services, stating that he had been obliged to secure their services to trace down certain matters, and that he had to guaranty payment under the belief that the defendant would do so; and the exclusion of such evidence was error.

3. To rebut the theory that one of the defendants had authorized or ratified the new employment by his acts, it was competent testimony that said defendant believed that the services were being performed for the said attorney and not for the defendant, and that the latter did not understand that the services were being performed under a supposed employment from him; and the exclusion of such testimony was error.

[Decided January 30, 1902.]

ERROR to the District Court, Laramie County, HON. RICH- ARD H. SCOTT, Judge.

This action was brought in the District Court by William A. Pinkerton, and Robert A. Pinkerton, co-partners, doing business under the firm name of Pinkerton National Detect-

ive Agency, against John H. Ward, Charles E. Stone and Thomas Blyth, to recover for certain services alleged to have been rendered by said plaintiffs, at the special instance and request of the defendants. On the trial judgment was rendered for the amount claimed against said defendants, Blyth and Stone. They separately moved for new trial, and the same being overruled they filed separate petitions in error. The material facts are fully stated in the opinion.

*John W. Lacey,* for plaintiffs in error.

In a guaranty such as the one in the case at bar the rule of exceedingly strict construction is applied, and a guarantor being a favorite in the law he will not be held bound unless it is perfectly clear that he has bound himself under the circumstances. It is clear upon the authorities that a guarantee will not be held to be a continuing one unless that purpose and intention is clearly expressed; and that when a guarantee contains no limit of the aggregate amount to be guaranteed and no limit as to time, the courts will hold it unreasonable that the guarantee shall be perpetual for unlimited amounts, and hence will hold that such a guarantee must be presumed to be limited to a single transaction. It is likewise clear that the service must be rendered for the exact person named in the guarantee, and that service for no other person will answer so as to make the guarantor liable. Applying these principles, we have a service to be rendered for one Harvey Booth, but no services are shown to have been rendered for such an individual. Second, the contract does not on its face say that it shall run perpetually, and yet fixes no period for its termination, nor does it fix an aggregate amount up to which it will be good or operative. Such a guaranty is held by all the authorities to be limited to a single transaction. In this case the operatives of the defendant in error performed services, and they were called in, and the bill for services paid, more than a year before the services were rendered here sued for. It is clear that the guaranty did not continue so as to render the parties

liable for the subsequent services. (Miller v. Stewart, 9 Wheat., 680; Staver v. Lock (Or.), 30 Pac., 497; Cushing v. Cable (Minn.), 50 N. W., 891; Barnes v. Barrow, 61 N. Y., 39; Markland Min. Co. v. Kimmel, 87 Ind., 560; La-Fayette v. James, 92 Ind., 240; Gunn v. Geary, 44 Mich., 615; Henrie v. Buck (Kan.), 18 Pac., 228; Gill v. Sullivan (Ia.), 17 N. W., 758; Ryan v. Williams, 29 Kan., 347; Burlington v. Johnson (Ill.), 12 N. E., 205; People v. Toomey (Ill.), 13 N. E., 521; Birdsall v. Peacock, 32 O. St., 177; Gard v. Stevens, 12 Mich., 292; Rogers v. Warner, 8 Johns., 119; Anderson v. Blakely, 2 W. & S., 237; Aldrich v. Higgins, 16 S. & R., 212; Cremer v. Higginson, 1 Mason, 323; Swartz v. Hyman, 107 N. Y., 562; Bank v. Kauffman, 93 N. Y., 273; Fellows v. Prentice, 3 Denio, 512; Cochran v. Kennedy, 10 Daly, 346; Sherman v. Malloy, 174 Mass., 41; Morgan v. Boyer, 39 O. St., 324; Averback v. Holley (Tex.), 26 S. W., 83; Boyce v. Ewart, Rice's Law, 126; Congdon v. Reed, 7 R. I., 576; Glass Co. v. Moore, 119 Mass., 435; Frost v. Wethersby, 23 S. C., 365; Melville v. Hayden, 3 B. & A., 593; Crooks v. Propp, 66 N. Y. Supp., 753; Cheshire Beef Co. v. Thrall, 47 Atl., 160.)

In the body of the instrument Thomas Blyth alone guarantees payment. The signature of Stone appears to this guarantee. What is the effect as to him under the facts? When a third person merely annexes his name to a contract which does not mention him in the body of it, and which is in itself a complete contract between other parties who signed it and are mentioned in it, such third person does not thereby become a party to the efficient and operative parts of the contract. (Lancaster v. Roberts (Ill.), 33 N. E., 27.)

Upon the foregoing authorities and principles it is submitted that in this action at law, which recovers upon the contract as it reads, or not at all, no judgment could go upon the facts against the defendants.

First—Because the person for whom services were to be rendered and the payment for which was guaranteed was

Harvey Booth, and no services were rendered for Harvey Booth.

Second—If the person to be served was Harvey Booth's estate, as may possibly have been the intention, and the facts outside of the contract, then the doctrine that guarantees must be construed as not continuing applies and the single service ending in March, 1895, exhausted the guarantee, and when that bill was paid the contract was at an end.

Causes numbers "4" and "5" of the motion for a new trial relate to the exclusion of certain letters and certain parts of a letter written by Walter R. Stoll to Thomas Blyth. Mr. Stoll was a witness in the cause and gave testimony tending to show that he had been authorized by Thomas Blyth to employ the plaintiffs in relation to the services herein rendered. While testifying as a witness he was asked as to those letters and the statements contained in them. Among other things, Mr. Stoll in one of those letters stated: "I was obliged to wire for Mr. Ward and obliged to accept the assistance of the Pinkertons in tracing certain matters down. Mr. Ward will explain these matters to you in detail. I had to guarantee their expenses upon the belief that they would be guaranteed by you or some others when the facts became known." Our view is that this was proper evidence tending to impeach the testimony given by Mr. Stoll in the sense that impeachment shows the weight or lack of it that ought to be given to his testimony, his letters written at the time indicating clearly that he had no agreement with Mr. Blyth authorizing him to employ detectives, but, on the contrary, he himself guaranteed until such time as some other person interested, either Mr. Blyth or somebody else, might guarantee.

Causes 6, 7, 8 and 9 in the motion for a new trial relate to the refusal of the court to permit Thomas Blyth to testify that, so far as he was concerned, although in fact he knew that the Pinkertons were present at the trial of the Crocker case in 1896, he did not understand in any way that they were present under any employment by him.

It has already been shown in evidence that at the trial of the Crocker case in 1896 Blyth was called upon to sign a guarantee for the services then being rendered by the Pinkertons. This request upon him was made by the representative of the Pinkertons and was declined by Mr. Blyth. In the cross-examination of the witness Blyth conducted by the plaintiffs here, the fact that Mr. Blyth knew the Pinkertons were rendering services was brought out. The court itself upon the trial asked the witness Blyth on the cross-examination certain questions that clearly brought out that Mr. Blyth knew that the detectives were at the trial in 1896. The manner in which this was brought out shows very clearly the inference intended to be drawn from it. It was not in any way competent or material to the case excepting for the purpose of inferring therefrom something in the nature of an estoppel.

For the purpose of meeting the inference thus drawn from the evidence above quoted, the plaintiffs in error sought in every way an opportunity to obtain from Mr. Blyth's lips the facts as to why it was that he did not protest against the presence of the detectives. He sought to show that he had arranged with Mr. Stoll a gross fee, which should include the employment of detectives, Mr. Stoll paying for the detectives out of the fee thus paid, and that under all the circumstances he did not for a moment suppose that the presence of the detectives at the trial was under the guarantee or under any employment which made Mr. Blyth or Mr. Stone in any way responsible for the services rendered. If it was competent or material to prove the defendant Blyth's knowledge of the presence of the detectives for the purpose of binding him, it was certainly competent and material to prove facts showing that such knowledge, in the light of all the facts, did not in any way tend to bind him or to bind this plaintiff in error Stone. (Lux v. Haggin, 69 Cal., 367; Murphy v. Clayton, 113 Cal., 160; Chellis v. Coble, 37 Kan., 558; Robb v. Shepherd, 50 Mich., 189; Kuhl v. Jersey, 23 N. J. Eq., 84; Mut. Life Ins. Co. v. Norris, 31 N. J. Eq.,

583; Brown v. Bowen, 30 N. Y., 519; McMasten v. Insurance Co., 55 N. Y., 325.)

*M. J. Barry,* for defendants in error.

A guaranty should be construed like other contracts, and should be construed in the light of the surrounding circumstances, bearing in mind the object the parties had in view. (Brandt on Sur., 156; id., 92; Hotchkiss v. Branes, 34 Conn., 27; Bank v. Gerke, 68 Md., 449; Crist v. Burlingame, 62 Barb., 351; Beach Contr., 719; id., 708; Brawley v. U. S., 96 U. S., 168; Robinson v. Bullock, 58 Ala., 618; Vincennes v. Citizens' L. Co., 132 Ind., 114; Engles v. Dexter, 77 Ga., 36; Matthews v. Phelps, 61 Mich., 327; Merriam v. U. S., 107 U. S., 437.)

A continuing guaranty is where by the terms of a written guaranty it appears that the parties look to a future course of dealing for an indefinite time, or a succession of credits to be given. (14 Ency. L., 1139; Crist v. Burlingame, 62 Barb., 351.) The guaranty is shown to be a continuing one in this case by applying the above rule. It is for "services to be rendered" an indefinite time. It covered a succession of credits. It was impossible to estimate the expenses of the operatives beforehand. It was clearly intended that the agency should do all they could, and so long as services were rendered, and no withdrawal of guaranty made, the signers were liable. The evidence nowhere shows that the guaranty had been revoked or recalled. To revoke, explicit language is necessary. (Lanusse v. Barker, 3 Wheat., 101.)

It could not have been the intention of the parties that Harvey Booth, the murdered man, or his body, should be bound for the services, or that the service should be performed for him. It was a settled fact that he was dead, and it was desired to investigate the murder and secure conviction of his murderer. The name of Harvey Booth was used merely to designate the case. Blyth was not administrator of the Booth estate when he signed the guaranty. On account of relationship he had an interest in the arrest and

conviction of the murderer.  He even employed an outside attorney to aid in the prosecution.  He made a contract in which the services of defendants in error was a continuing consideration, the benefit of which he received and never renounced.  The nature of the duty explains the intent.  The work was not completed until the end of the second trial of the accused.

. The contract was a continuing one under the rule.  It appeared that the parties looked to a future course of dealings for an indefinite time.  (Twohy v. McMurran, 57 Minn., 242.)  The guaranty is to be construed so as to promote the use and convenience of commercial intercourse.  (Davis v. Wells, 104 U. S., 159.)  It is to be construed according to what is to be fairly presumed the parties understood, without any technical nicety.  (Lee v. Dick, 10 Pet., 482; Bank v. Kaufmann, 93 N. Y., 273; Lawrence v. McCalmont, 2 How. (U. S.), 436; Weiler v. Henarie, 15 Or., 28.)

When Mr. Stoll wrote to Blyth about the employment and the expectation that the latter would guarantee the payment for services he did not know that a guaranty had already been signed.  As to Blyth's proffered testimony, a party is bound by conduct and words, and cannot escape because of ideas in his mind.  Blyth knew that the Pinkertons held his guaranty and that work was being done.  He never intimated that he was not bound; but evidence was introduced to show a new promise on his part.

Knight, Justice.

This action was brought in the District Court by defendants in error as plaintiffs against plaintiffs in error and one John H. Ward as defendants, by a petition of a single count, alleging "that the defendants herein jointly and severally promised to pay to the plaintiff the sum of eight dollars per day and expenses for each operative sent out by plaintiffs to perform certain investigations in the matter of the murder of one Harvey Booth in Evanston, State of Wyoming, on or about January 27th, 1895.  That at the special in-

stance and request of the defendants, and at the special instance and request of each of them, and in consideration of their said joint and several promise to pay, the plaintiff rendered services which, at the said rate of payment, amounted to the sum of $658.25. * * * That the defendants and each of them did guarantee the payment of the said services rendered by the plaintiff amounting to $658.25."

The defendants named in said petition were John H. Ward, Thomas Blyth and Charles E. Stone. Issue was joined by a general denial, and a trial resulted in dismissing said case as to defendant John H. Ward, and findings and judgment against the plaintiffs in error, Thomas Blyth and Charles E. Stone, for the amount claimed, with interest. From said judgment, said Thomas Blyth and Charles E. Stone come to this court alleging the following errors, as set out in their motion for a new trial:

1. The finding of the court is not sustained by sufficient evidence.

2. The finding of the court is contrary to the evidence.

3. The finding of the court is contrary to law.

4. The court erred in excluding from the evidence in said cause the letter of one W. R. Stoll, dated June 9th, 1896.

5. The court erred in excluding from the evidence the following portion of that certain letter written by W. R. Stoll to the defendant Thomas Blyth, and dated June 9th, 1896, which is in words and figures following, to-wit:

"That I was obliged to wire for Mr. Ward, and obliged to accept the assistance of the Pinkertons in tracing certain matters down. Mr. Ward will explain these matters to you in detail. I had to guarantee their expenses, upon the belief that they would be guaranteed by you or some others when the facts became known."

6. The court erred in refusing to permit the defendant to prove by the witness Thomas Blyth, one of the defendants in said cause, that the said witness supposed that the plaintiffs were performing their services for which this claim is made in this cause for W. R. Stoll, and not for the defendants.

7. The court erred in refusing to permit the witness, Thomas Blyth, to testify in said cause that he had no idea that the plaintiffs were rendering any service here on behalf of the defendants, or either of them.

8. The court erred in refusing to permit the defendant to prove by the witness, Thomas Blyth, one of the defendants in said cause, that he, the said Thmas Blyth, did not in any way understand that the presence or services of the plaintiffs, or any of them, in rendering the services here in question, were performed under any employment, through or under the defendants, or for which they were in any way responsible.

9. The court erred in refusing to permit the witness, Thomas Blyth, one of the defendants in said cause, to testify as to his reason for not objecting to the presence and employment of the plaintiffs in performing the services sued for in this cause.

A statement of facts from the record in this case proves most unsatisfactory, and is in substance as follows: That on or about January 27th, 1895, one Harvey Booth was murdered in Evanston, Uinta County, Wyoming, and as a result of negotiations between John H. Ward, originally one of the defendants herein, who was at the time sheriff of said Uinta County, defendant in error, the Pinkerton Detective Agency was on February 10th, 1895, regularly employed by Thomas Blyth, one of the plaintiffs in error, in the matter of the investigation of said murder. The date of such employment is fixed by the evidence to the effect that before services are rendered by defendant in error a guarantee is always required, and the one introduced in evidence herein bears that date, and reads as follows:

"GUARANTEE.

"In consideration of the services hereafter to be rendered by the Pinkerton National Detective Agency for Harvey Booth of Evanston, Wyo., I, Thomas Blyth, of Evanston, Wyo., hereby guarantee the payment of said agency's bill for services in the case at the rate of $8.00 per day, and the

expenses of each operative from the time they leave the office of the agency until their return.

> "THOS. BLYTH. [Seal.]
> "CHAS. STONE. [Seal.]

"JAS. McPARLAND.
"Feb. 10th, 1895. Denver, Colo."

As has been said, the record is unsatisfactory; the reason being that it fails to show when the first trial at Evanston was had, who was tried, except by inference, what kind of a verdict, if any, was found, and how it became competent to change the venue to Cheyenne. Counsel for defendant in error supplies some omissions in the record which are important, in his brief, as follows:

"The statement of the case made by counsel for defendant Blyth, while correct in the main, argument omitted, is rather brief and not given in order of time. For these reasons a new statement is made, giving more detail. "Statement—One Harvey Booth of Evanston, Wyoming, was murdered about January 27th, 1895. The Pinkerton National Detective Agency was hired to investigate the murder with view of bringing murderer to justice. A representative of the Pinkertons, in order to secure payment of services to be rendered by agency, secured the following paper, signed by Thomas Blyth and Charles E. Stone. The paper was a printed blank used by the Pinkertons, the words underlined being written by hand." Then follows the guarantee as set out hereinbefore, and continuing: "Services were rendered, several operatives being employed. As a result one Crocker was arrested, tried in Evanston, convicted. New trial and change of venue granted; tried second time in Cheyenne and acquitted. The murder case closed in Cheyenne about July 1st, 1896.

"All bills rendered by Pinkertons in first trial were paid either by or through Blyth, who was brother-in-law of murdered man, and also his administrator. Blyth was present on second trial, knew the Pinkertons were rendering services, and knew that they held his guarantee, but never re-

called it.   There is evidence that Blyth offered $250 as
payment of account now in judgment, and after offer was
rejected, renewed promise of payment, also that he gave out
an idea of his being responsible for payment."

Stopping at this point, where the trial court, as from the
record appears, had no right to stop for want of information
that at any time any one transaction had been completed;
we find that, as is claimed, the employment of defendant in
error, occasioned in part by the guarantee in evidence, had
resulted in the arrest of Crocker for the murder of Booth,
and that their services had been dispensed with (which is
claimed temporarily) by the demand that their operative be
recalled and the payment by Blyth of all claim and demands
to that date (April, 1895).

There is no conflict in the evidence as to what occurred at
that time.   Mr. McParland, superintendent as aforesaid of
defendants' agency in Denver, testified:   "A good deal of
work was done in the way of making investigations as to the
murder of Harvey Booth.   Bills for work done in January,
February, April, 1895, were paid by Thomas Blyth."   The
testimony of Thomas Blyth as to what occurred in April,
1895, not denied, is as follows:

Q.   The day prior to the settlement and payment in April,
1895, what had been done, if anything, with reference to dis-
charging Pinkertons in the matter?

A.   I wrote to Mr. McParland to recall the detectives and
send the bill.

Q.   What was done under that?

A.   The detective was immediately recalled and bill ren-
dered.

Q.   And was paid?

A.   Yes, sir.

Q.   Who else was cognizant of the recall?

A.   Mr. Beard and Mr. Ward.

Subsequently and while defendant in error had no con-
nection with the case Crocker was tried, convicted of the
murder of Booth, made application for a new trial, which

was granted, and thereafter the venue of the case was changed to Cheyenne. The only evidence that connects defendant, John H. Ward, who was one of the defendants in the court below, with the transaction up to this point was that he sent the original telegram to the agency of the Pinkertons at Chicago at the time the murder was discovered, which was referred to the Denver agency, and had knowledge of the employment of the Pinkertons, advised, worked and counselled with them in their operations. After the first trial, and after the case had been sent to Cheyenne, it became necessary to make new contracts in some particulars, as appears from the record, and W. R. Stoll, Esq., an attorney of Cheyenne, was employed by Mr. Blyth to conduct or assist in the prosecution. Mr. Stoll had been recommended by Mr. McParland to Mr. Blyth when the latter had applied to him to name the best attorney in Wyoming to be employed.

In June, 1896, more than a year after the services were rendered by the defendant in error under the guarantee aforesaid, and the same had been terminated by accord and satisfaction, as is claimed by plaintiffs in error, Mr. Stoll discovered an emergency requiring the assistance of a detective, and by wire secured the services of defendants in error, and from then on and during the second trial the services sued for, which are admitted were of the value claimed, were rendered.

Mr. Stoll, after securing the services of the defendant in error as aforesaid, on June 9th, 1896, wrote Mr. Blyth in part as follows: "That I was obliged to wire for Mr. Ward and obliged to accept the assistance of the Pinkertons in tracing certain matters down. Mr. Ward will explain these matters to you in detail. I had to guarantee their expenses upon the belief that they would be guaranteed by you or some others when the facts became known."

The sustaining of the objection to the offer of the part of the letter aforesaid forms the fifth ground in the motion for a new trial presented by plaintiff in error, Charles E. Stone. The evidence discloses the fact that while the services sued

for were being performed a second guarantee was prepared and presented to Mr. Blyth for his signature, and that he refused to sign the same. This is explained by Mr. McParland, general superintendent, as aforesaid, by the statement that the original guarantee in evidence was for a time misplaced or mislaid, and that fact caused the request for a new guarantee to be made.

During the second trial the office of Mr. Stoll was the place where the meetings of those interested in the prosecution was held, and, as the statement was made in the brief of defendants in error, and in the argument of counsel before this court, based thereon that "there is evidence that Blyth offered $250 as payment of account now in judgment, and after offer was rejected renewed promise of payment, also that he gave out an idea of his being responsible for payment," referring to certain evidence. We will give that evidence. William B. Sayles, an operative of defendant in error, upon that point, testified as follows:

Q. Now you may state what conversation you had with Mr. Blyth in regard to pay for the agency.

A. It was on the occasion of a meeting I had with Mr. Blyth, Mr. Hamm, Mr. Ward and Mr. Stoll in Mr. Stoll's office in this town, in which, acting under instructions from Mr. McParland, I wanted to get advance expense money, and said that I had been instructed by Mr. McParland to get money on expense account in this matter. During that conversation Mr. Hamm, who was acting attorney, and also Mr. Blyth, asked if two hundred and fifty dollars would be the amount of expense, and had a paper drawn up to that effect if I would accept. I was not authorized to accept two hundred and fifty dollars, or any sum. I told them I was not authorized. I told them I traveled a good deal on the railroad, to Deer Lodge, to Salt Lake, two or three trips to Denver here. I said I knew my railroad expenses were pretty heavy. I said that I didn't know the amount and refused it. Then I was given to understand—I remember the conversation quite distinctly at that time in the office, Mr.

Stoll being present—that the matter would be satisfactorily adjused.

Q.   Who said that the matter would be satisfactorily adjusted?

A.   Mr. Hamm or Mr. Blyth, I don't know which one.

Q.   Were they both present at the time?

A.   They were both present; I don't know who spoke; so far as that statement, I cannot swear.

Q.   If Mr. Blyth did not make the promise, he made no objection to it when it was made?

A.   All four were present when this was done. Mr. Stoll, I think, had gone out of the room and was in his office. I know we were all in the building.

Q.   Did they at that time ask you to continue the work?

A.   I don't know that they asked me to continue the work. I was working at that time in the discharge of my duties of my work at that particular time that day.

Q.   Was there any difficulty about your pay; were you going to quit or keep on working if you did not get your money?

A.   I did not say I was going to quit; I spoke to Mr. Stoll about it, and I spoke to Mr. Ward at that time about it. I was given to understand it was all right. We were all four present at one time during the day.

Q.   (By the court.)   Who were the four?

A.   Mr. Stoll, Mr. Ward, Mr. Hamm, attorney in the case.   *   *   *

Q.   Just be clear on one point; you may state whether or not in the conversation you heard in Mr. Stoll's office any of the defendants in this case, or any other persons, promises were made that pay could be forthcoming. (Objection to form of question.) By the court: Ask what was said with reference to pay at the time and place.

A.   I can't give you the eaxct words. It has been some years ago, and I don't recollect the exact words. The substance of it was that the settlement of the bill of services would be all right in this case. The substance of the conversation was that the bill would be paid.

On cross-examination this witness was·asked the following questions:

.Q.   You do not know who it was said your services would be paid; you do not know whether it was Hamm or Ward or Blyth?

A.   No, I do not know.

Q.   Mr. Hamm was not an attorney for·Mr. Blyth?

A.   Mr. Hamm, I don't know anything about that; he was connected with the case.

Q.   He was County Attorney of Uinta County, and authorized in a way to contract bills for that county.

A.   I did not know anything about that; at that time I would not have taken any authorization from Mr. Hamm without knowing what he did it on.

Q.   Whatever was said, you do not know whether it was Mr. Hamm or somebody else?

A.   Mr. Hamm offered this paper $250 settlement, which I refused; asked if that is right, I said no. They wanted to know how much it would be, wanted me to make statement. I said, No.

Later on the same witness testifies as follows:

Q.   It was not settled who would pay it, is that what you mean to say?

A.   It was my understanding that the services would be paid for in the presence of Mr. Blyth, Mr. Hamm and Mr. Ward, all of whom heard it at that time as well as I heard it.

Q.   As I understand you, you don't know who?

A.   One of those gentlemen.

Mr. Blyth testified about the matter above referred to as follows:

Q.   You have heard Mr. Sayles' statement as to the conversation in Mr. Stoll's office, when you and Mr. Ward and Mr. Hamm were claimed to have been present. You may state what, if anything, of that conversation occurred.

A.   I never had any such conversation in Mr. Stoll's office.

Mr. Ward testified upon the same subject as follows:

Q. You have heard the testimony here of Mr. Sayles as to the conversation in his presence in relation to payment of Pinkertons for their services; did you hear the testimony?

A. Yes, sir.

Q. You may state whether at any time there was an agreement by Mr. Blyth or yourself, or anybody in your presence, that that bill should be paid?

A. Not in. my ·presence, sir.

Mr. Hamm, the other person referred to by witness Sayles as having been present at the time of the conversation referred to, was not a witness in the case.

Charles Stone, one of the plaintiffs in error, against whom judgment was rendered in the court below, and who has been described in all the pleadings and proceedings, except in the guarantee which he signed, as Charles E. Stone without any apparent cause, testified in part as follows:

Q. You may state what knowledge you ever had during the time of its performance of any service by the Pinkertons in this matter after the settlement was made in April, 1895.

A. None whatever.

Q. What authority did you give to anyone· to employ Pinkertons on your behalf or anybody else to do detective work after April, 1895?

A. None whatever.

The above evidence is not modified, qualified or questioned in the entire record.

It is not necessary to continue the unraveling of facts which seemed to be required, for the reason that all parties appeared to rely upon the general notoriety gained by the terrible murder out of which this controversy grew, and the attempts made by the State of Wyoming and private individuals to find, present and punish the guilty.

Counsel for defendant in error includes in his brief the opinion claimed to have been announced by the trial judge in rendering his judgment, which is not included in the record of the case before us. While it would not be fair to quote

this opinion without giving all the evidence, some of which that is omitted might have had great weight in its being arrived at, still in view of the fact that Charles Stone, one of the judgment debtor defendants in the court below, was never shown to have obligated himself by word, sign or deed beyond signing his name to the guarantee executed February 10th, 1895, not sued on, but offered in evidence, we will quote from the opinion sufficient to show that it was for lack of evidence that caused the court below to commit some of the errors complained of. We quote in part:

"That it was a continuing contract in the light contended for by the plaintiff seems clear to the court, and that it appears further equally true that there was no cancellation of the contract by the defendants. And that the contract expired at the close of the second trial; and that the account sued on is a just debt under the contract."

We are constrained to ask, Why did the contract expire at the close of the second trial? It was at the close of the first trial that it was thought the murderer of Harvey Booth had been discovered and brought to justice. At the close of the second trial this was found to be a mistake, and all the efforts and expenditures had been for naught.

The diligence of the attorneys in presenting authorities applicable to the proper consideration of this case must be commended, and as there is little if any dispute as to the law that should govern, we have discussed the facts at length. The plaintiffs in error insist that the guarantee in evidence is not a continuing guarantee, and that there is nothing in the instrument itself fixing the limits of time for which it shall run nor fixing the aggregate amount for which it shall be good, and that such instrument cannot be construed as a continuing guarantee. "That a guarantor like a surety is bound only by the strict letter or precise terms of the contract of his principal, whose performance he has guaranteed, and in this respect he is a favorite of the law, and that this must be remembered in determining the liability, and that he has the right to stand upon the strict terms of his obligation when

such terms are ascertained." And counsel cites in support of these contentions. (Miller v. Stewart, 9 Wheaton, 680; and to the same effect, Staver v. Lock, 30 Pac., 497; Cushing v. Cable, 50 N. W., 891; Barnes v. Barrow, 61 N. Y., 39; Markland v. Kimmel, 87 Ind., 560; La Fayette v. James, 92 Ind., 240; Gunn v. Geary, 44 Mich., 615; Henrie v. Buck, 18 Pac., 228; Gill v. Sullivan, 17 N. W., 758; Lang v. Pike, 27 Ohio, 498; Ryan v. Williams, 29 Kan., 347; Burlington v. Johnson, 12 N. E., 205; People v. Twohey, 13 N. E., 521.)

As to the contention made by plaintiffs in error that by the terms of a guarantee, such as is here in evidence, the guarantor cannot be held beyond the immediate transaction, counsel cite Birdsall v. Peacock, 32 O. S., 177, the case briefly stated being as follows: The guarantee was: "Send my son the lumber he asks for and it will be all right." The son at once bought $226 worth of lumber on credit and afterwards paid for it. But the matter did not stop there. The first purchase was May 11th, 1868; afterward he bought additional lumber down to January, 1869. The court confined the guarantee to the first purchase of May 11th, 1868, and in closing a very interesting opinion says: "The better opinion would seem to be that such an instrument should be confined to the immediate transaction, unless the language of the promise is sufficiently broad to show that it was meant to reach beyond the present, and render the guarantor answerable for future credits. The tendency of decisions in this country has accordingly been against construing guarantees as continuing unless the intention of the parties is so clearly manifested as not to admit of a reasonable doubt. 2 Am. Lead cases, 141, citing Congdon v. Read, 7 R. I., 576." And several other cases are cited.

In the case of Gard v. Stevens, 12 Mich., 292, the guarantee was: "If you will let the bearer have what leather he wants and charge the same to himself, I will see that you have your pay in a reasonable time." The court in discussing this question says:

"As the plaintiff sold the leather to Gates at several different times and for different amounts, the first question is whether the guarantee is limited as to time. We think it limited to a single purchase or transaction. We must hold this, or that it is unlimited both as to time and amount. Every person is supposed to have some regard to his own interest, and it is not reasonable to presume any man of ordinary prudence would become surety for another without limitation as to time or amount unless he has done so in express terms or by clear implication. If the guarantee was limited in express terms, either as to time or amount, but not as to both, it might be said it was the intention of the guarantor to leave it open as to the other, or that a further limitation could not be implied. But where it contains no express limitation as to either, and there is nothing in the instrument itself from which it can be inferred that it was the intention of the guarantor to leave it open as to both, we think it must be understood as referring to a single transaction."

In the case of Rogers v. Warner, 8 Johnson, 119, the guarantee was: "Our sons wish to take goods of you on credit. We are willing to lend our names as security for any amount they may wish." Goods were bought at several different times on credit. The court says: "The true construction of the letter of credit is that it is to be confined to the first parcel of goods. It would be unjust and unreasonable to extend it to an indefinite credit for an indefinite time."

To the same effect were the following authorities cited by plaintiffs in error. (Anderson v. Blakely, 2 Watts and Sergt., 237; Aldrich v. Higgins, 16 S. and R., 212; Brittain Dry Goods Co. v. Yearout, 54 Pac., 1062; Cremer v. Higginson, 1 Mason, 323; 6 Fed. Cases, 797, and many others.)

Defendant in error contends that the guarantee in evidence is a continuing one, "and in order to determine that question we have to construe its terms in the light of other surrounding circumstances at the time of its execution." And several authorities have been cited in support of that contention,

which is not denied. The Supreme Court of New York used the following language many years ago, and from the authorities examined we have found none more concise, applicable to the case before us: "The party entering into an absolute engagement for the responsibility of his friend should see to the performance of it: the relation in which the parties afterwards stand to each other presupposes privity and knowledge of the credit obtained. It is in most of these cases a nice and difficult question to determine whether the guaranty is a continuing one or not. The intent of the party to be derived from the words is the only sure guide, and, therefore, very little aid is to be derived from the adjudged cases, as they turn upon the peculiar phraseology of the guaranty. Upon general principles a strict interpretation should be applied in favor of a surety." The same court later, in Baker v. Rand, 13 Barb., 152, says: "If the plain terms of the contract may be filled by being confined to one transaction, courts are not anxious to extend it to others." As to surrounding circumstances, a case fairly well describing that language is Morgan v. Boyer, 39 O. S., 324. We quote from the opinion: "The defendant, H. A. Bowlus, a merchant of Melmore, in Seneca County, had at different times purchased small quantities of goods upon credit of the plaintiffs, partners under the name of Morgan, Root & Co., who were merchants of Cleveland; and in order to obtain from them further credit, he procured from the defendant, H. A. Boyer of Tiffin, a written guaranty in the following words: 'Tiffin, April 11th, 1876. Messrs. Morgan, Root & Co.: Gents: The bearer, Mr. H. A. Bowlus, is visiting your city, buying a few goods in your line, and anything you may be able to sell him will be paid promptly, as agreed on, which I herewith guarantee. Yours respectfully, H. A. Boyer.' Bowlus delivered this guaranty to the plaintiffs about April 12th, 1876, and then purchased of them on the faith of the guaranty goods to the amount of $797, for which he afterwards paid in full. The plaintiffs continued to sell goods to Bowlus from time to time until about September

20, 1879, when the balance due from him was $301.12, for which the plaintiffs brought suit against Bowlus and Boyer. The case was submitted to the Court of Common Pleas, which rendered a judgment in favor of the defendant, Boyer, and this judgment was on error affirmed by the District Court. The plaintiffs ask leave to file a petition in error to reverse the judgment of the District Court. The principal question argued by counsel and the one requiring our decision is whether the guaranty given by the defendant, Boyer, is a limited or a continuing guaranty. The language of guaranties is often so indefinite and their construction in this respect so difficult, and the decisions relating to such construction are very numerous and conflicting. This conflict has in many cases arisen from the difference in the surrounding circumstances and the language of each guaranty, but in many cases it is due to the application by the several courts, of the different rules to the construction of those contracts. The rules which we apply in this case are those which are in accordance with previous decisions of this court, and those which we deem to be most in accordance with well established principles of law. The rule that the language of a promise is to be construed most strongly against the promisor cannot properly be applied to the construction of a guaranty. A guarantor, like a surety, is bound only by the precise words of his contract. Other words cannot be added by construction or implication, but the meaning of the words actually used is to be ascertained in the same manner as the meaning of similar words used in other contracts. They are to be understood in their plain and ordinary sense, when read in the light of the surrounding circumstances and of the object intended to be accomplished. The rule that a guarantor is held only by the express words of his promise does not entitle him to demand an unfair and strained interpretation of those words, in order that he may be released from the obligation which he has assumed. In applying these rules there has been much difference of opinion as to whether the language of a guaranty should be construed as creating a limited

or a continuing guaranty when it is fairly capable of either construction, but we are satisfied that the decided weight of authority is in favor of the rule stated by Judge Story, that in a doubtful case the presumption should be against the construction that the guaranty is continuing. * * * Applying to the construction of this guaranty the rules which we have stated, with the aid of the surrounding circumstances, and the purpose for which it was given, we are led to the conclusion that the plaintiffs were not justified in treating it as a continuing guaranty."

Reference is made in the record of the case in the court below several times to the fact that the plaintiffs in error, Blyth and Stone, never cancelled or recalled the written guaranty signed by them. They both admitted it on the witness stand, and the court, if correctly quoted by counsel, attached some importance to that fact.

Counsel for defendant in error refers to the same both in his brief and argument in this court and cites us to Lanusse v. Barker, 3 Wheat., 101, and we quote from the syllabus, which correctly states the opinion upon that point: "When an authority has been once given to a merchant abroad and has been acted on in good faith, implied revocations are not favored, it is incumbent on the principal to show a revocation in terms too clear to be charged with equivocation;" and also in the same case the language quoted by counsel: "Nowhere in the evidence is it shown that the guaranty had been revoked or recalled. To revoke the guaranty explicit language should be used." Counsel is excused without the asking for failing to call our attention to the language of the court upon this subject in Twohy v. McMurran, 57 Minn., 242, cited by him upon another branch of the case, one already considered. We quote: "The fact that the guaranty itself was not taken up by defendant at the time he claims to have paid, in accordance with its terms, cannot be regarded as a practical construction of its language or an admission that it was continuing." We have not found any authority to the contrary.

We are of the opinion that the guaranty offered in evidence

was not a continuing one; and that if, under the petition upon a new trial of this case, it should be claimed that plaintiff in error, Thomas Blyth, became liable for the services in controversy by reason of his having authorized the contracting for the same, or by reason of having in some way become bound for the payment therefor by any words, acts or benefits, which we are free to say does not appear from the record before us, then he should be allowed to defend against such claim, and it was error to reject the testimony offered as shown by causes numbered 4, 5, 6, 7, 8 and 9 in the motion for a new trial, as hereinbefore set out in full.  The judgment of the District Court will be reversed and the cause is remanded to that court for further proceedings, in accordance with the views herein expressed.                    *Reversed.*

POTTER, C. J., and CORN, J., concur.