**Joe H. TOLAND and Mary Lynn Toland, Appellants (Defendants and Third Party Plaintiffs),**

v.

**KEY BANK OF WYOMING, formerly First Wyoming Bank Sheridan Main, Trustee of the Henry G. Oswald and Margaret Oswald Trust created for the benefit of Henry G. Oswald and Margaret Oswald and their descendants under the Trust Agreement dated March 31, 1987, Appellees (Plaintiffs and Counter Defendants),**

**and**

**Henry G. Oswald and Margaret Oswald, husband and wife, Appellees (Third Party Defendants).**

**No. 92–34.**

Supreme Court of Wyoming.

Feb. 19, 1993.

Timothy S. Tarver, Sheridan, for Tolands.

Kim D. Cannon of Burgess, Davis, Carmichael & Cannon, Sheridan, and Kate M. Fox of Burgess, Davis, Carmichael & Cannon, Cheyenne, for Key Bank of Wyoming.

H.W. Rasmussen of Badley & Rasmussen, P.C., Sheridan, for Oswalds.

Before MACY, C.J., THOMAS, URBIGKIT* and GOLDEN, JJ., and BROWN, J., Retired.

MACY, Chief Justice.

Joe and Mary Toland appeal from a summary judgment order in which the district court declared that Key Bank of Wyoming, Trustee of the Henry G. Oswald and Margaret Oswald Trust, was partially discharged of its obligations as guarantor of Oswald Jewelry & Gifts, Inc. in an owner-financed, business-sale transaction. The district court discharged Trustee Key Bank to the extent that the Tolands had impaired the collateral pledged as security for the Oswald Jewelry debt by failing to perfect a first priority security interest in such collateral.

We reverse and remand.

The Tolands raise the following issues for review:

1. Are Appellants Joe and Mary Lynn Toland entitled to have the documents used in this transaction reformed so that they accurately express the agreement of the parties as it existed at the time the documents were signed?

2. Did the Oswald Trust consent to the impairment of the collateral in this transaction?

3. Are the Tolands entitled to recover damages from the Oswald Trust due to the Oswald Trust's failure to provide space for the Tolands to operate their liquor license in?

4. Are the Tolands entitled to recover additional attorneys fees for the expense of this appeal and for any further proceedings, as provided by the contract?

The Tolands operated Capitol Drug Store, Inc., as well as a liquor store, in a building which they independently owned in Sheridan, Wyoming. Capitol Drug sold over-the-counter and prescription drugs as

---

* Chief Justice at time of oral argument; retired January 1, 1993.

well as sundry merchandise typically carried by small-town drug stores. In late 1985, the Tolands decided to sell Capitol Drug and retire. They advertised in various trade journals and by word of mouth that the business was for sale.

Don and Bonnie Oswald, d/b/a Oswald Jewelry & Gifts, Inc., contacted the Tolands in September 1987 about buying Capitol Drug. The Tolands and the Oswalds reached a preliminary, oral agreement pursuant to which Oswald Jewelry agreed to buy Capitol Drug for $160,000 cash and to lease the building from the Tolands. The terms of the preliminary, oral agreement were changed by subsequent negotiation.

The Oswalds contacted Don's parents, Henry and Margaret Oswald, to see if they would assist Oswald Jewelry to purchase Capitol Drug. Henry did not want the Oswalds to borrow such a large amount of money on behalf of Oswald Jewelry; nor did he want the Tolands to have control of the building. Accordingly, Henry informed James Sparks, trust manager for Trustee Key Bank, that he wanted the Henry G. Oswald and Margaret Oswald Trust to purchase the Tolands' building. Mr. Sparks recommended that an attorney be retained to represent the Trust in the negotiation of the building purchase.

Following the meeting with Mr. Sparks, Henry telephoned the Tolands to broach his concerns over the Capitol Drug sale. Henry suggested that the Tolands finance the sale and also that they sell their building for $75,000. As consideration, Henry offered to guarantee the obligations undertaken by Oswald Jewelry. The Tolands were agreeable to these terms, except with respect to the price for the building. The Tolands wanted $100,000 for the building.

As negotiations over the building were on-going, the Tolands and the Oswalds met with their respective attorneys concerning the sale of Capitol Drug. At this meeting, the Oswalds' attorney prepared a memorandum which reflected some of the essential sale terms as of December 11, 1987. These terms were that the Tolands would sell Capitol Drug for a total purchase price of $160,000, receiving a $30,000 down payment and a security interest in the inventory. Contingent provisions were also made for the operation of the Tolands' liquor store depending upon whether the building sale did or did not materialize.

The Tolands and Henry ultimately agreed upon a sale price of $85,000 for the building. Mr. Sparks thought that "it was a steal." After this deal was struck, the Tolands' attorney began to prepare the documents for the sale of Capitol Drug to Oswald Jewelry and for the sale of the building to the Trust. He prepared an Agreement of Sale of Stock, a Promissory Note, a Guarantee, a Warranty Deed, a Mortgage Deed with Release of Homestead, a Security Agreement and Financing Statement, and an Agreement not to Compete.

The sale of Capitol Drug to Oswald Jewelry was to be accomplished by the Agreement of Sale of Stock, Promissory Note, Security Agreement and Financing Statement, and Agreement not to Compete. The terms of the Capitol Drug sale required Oswald Jewelry to undertake four essential obligations: (1) to pay a purchase price of $150,000 for the drug inventory, sundry merchandise, and accounts receivable, plus an additional amount for the furniture, fixtures, and equipment; (2) to assume Capitol Drug's accounts payable as of midnight on December 31, 1987; (3) to secure payment to the Tolands by giving them a security interest in the Capitol Drug inventory, maintaining a designated minimum inventory, insuring the inventory, and agreeing not to sell the inventory out of the ordinary course of business without the Tolands' consent; and (4) to operate the liquor store for the Tolands as independent contractors, remitting $150 a month to them.

The sale of the building to the Trust was to be accomplished by the Warranty Deed from the Tolands to Trustee Key Bank. Trustee Key Bank's guaranty of Oswald Jewelry's obligations was to be accomplished by a guaranty provision on the Promissory Note and by a separate written Guarantee. Trustee Key Bank's guaranty was to be secured by a Mortgage Deed

with Release of Homestead on the building to the Tolands.

Two closings were held on December 28, 1987. At the closing on Capitol Drug, the Tolands and the Oswalds, on behalf of Oswald Jewelry, executed the Agreement of Sale of Stock and an Addendum to Agreement of Sale of Stock which·deleted the minimum inventory requirement. The Oswalds also executed the Promissory Note to the Tolands, and the Tolands executed the Agreement not to Compete. The Security Agreement and Financing Statement covering the Capitol Drug inventory was not executed. At the closing on the building, the Tolands executed the Warranty Deed. Trustee Key Bank signed as guarantor of the Promissory Note and executed the separate written Guarantee as well as the Mortgage Deed with Release of Homestead back to the Tolands.

The Oswalds took possession of and began to operate Capitol Drug on January 1, 1988. On January 18, 1988, an Addendum to Agreement and an Addendum to Promissory Note were executed. These addenda finalized the financial terms of the Capitol Drug sale. Capitol Drug was sold for a total purchase price of $160,000. Oswald Jewelry was given a $30,000 credit for its down payment and a $19,594.59 credit for assuming the accounts payable, leaving a balance of $110,405.41 to be paid with interest in 120 monthly installments.

Oswald Jewelry/Capitol Drug began to experience financial difficulties in 1989. As a result, the Oswalds borrowed a substantial sum of money from First Interstate Bank on behalf of the businesses, pledging the Capitol Drug inventory as collateral. First Interstate Bank perfected a first priority security interest in the collateral.

Oswald Jewelry/Capitol Drug's financial nosedive continued into 1990. As a result, the Oswalds began to negotiate the sale of the Capitol Drug inventory to Buttrey Food and Drug. Buttrey would not buy the inventory, however, without receiving the Tolands' consent to the sale. Henry, Mr. Sparks, and the Tolands all eventually learned of the proposed sale, and, after numerous discussions and some correspondence, the Tolands executed the requested consent. The inventory was sold to Buttrey for $54,253. The sale proceeds went to First Interstate Bank.

Oswald Jewelry made its last payment to the Tolands on February 15, 1991, leaving an unpaid principal amount of $86,179.52. Oswald Jewelry then declared bankruptcy and received a discharge from further liability under the Agreement of Sale of Stock or Promissory Note. The Tolands notified Trustee Key Bank of Oswald Jewelry's default and requested that the default be cured per its guaranty. When it became evident that Trustee Key Bank was not going to cure the default, the Tolands gave notice of their intent to foreclose on the building.

Trustee Key Bank filed a Complaint in district court after it received the Tolands' notice of their intent to foreclose. It requested the district court to declare that its obligations as guarantor of Oswald Jewelry had been materially altered by the Tolands' failure to perfect a first priority security interest in the Capitol Drug inventory, to discharge it from liability for the Oswald Jewelry debt either entirely or to the extent of the impairment of collateral, i.e., $54,253, and to enjoin foreclosure on the building until a final judgment had been entered.

The Tolands responded by filing an Answer, Counterclaim and Third Party Complaint. In their Counterclaim, the Tolands requested the district court to reform the sale documents to reflect that the parties actually agreed at closing that no security interest would be taken in the Capitol Drug inventory, to enforce Trustee Key Bank's guaranty obligations by entering a judgment for $86,179.52 plus interest and attorney's fees, and to order foreclosure on the building. In their Third Party Complaint against Henry and Margaret Oswald, the Tolands asserted that Henry and Margaret were the real parties of interest, that Henry acted as a de facto trustee for the Trust, that Henry induced the Tolands to consent to the Buttrey sale, and that Henry and

Margaret and Trustee Key Bank should be estopped from denying liability.

As discovery proceeded in preparation for trial, Trustee Key Bank entered into a contract with Conrads, Inc. to lease the building with an option to purchase. The lease/option agreement failed to reserve space for the Tolands to operate their liquor store or to provide for the operation of their liquor store as required by the Agreement of Sale of Stock and the Guarantee. Consequently, the Tolands filed an Amended Answer, Counterclaim and Third Party Complaint on September 26, 1991, to add the liquor store damages claim.

Both the Tolands and Trustee Key Bank filed motions for summary judgments after the parties' depositions had been taken. The Tolands argued in their motion that, although a genuine issue of material fact existed as to reformation, they were nevertheless entitled to a summary judgment on Trustee Key Bank's guaranty. They contended that Trustee Key Bank expressly waived the impairment of collateral defense in the Promissory Note and that the de facto trustee, Henry Oswald, impliedly waived the defense by inducing the Tolands to consent to the Buttrey sale. The Tolands requested the district court to enforce Trustee Key Bank's guaranty through a summary judgment by entering a judgment for $86,179.52 plus interest and attorney's fees, by ordering foreclosure on the building, and by awarding damages for the liquor store claim.

Trustee Key Bank argued in its motion that reformation of the documents was inappropriate because the documents clearly required the Tolands to hold a security interest in the Capitol Drug inventory. Trustee Key Bank contended that it was entitled to a discharge from its obligations as guarantor in the amount of $54,253 because of the Tolands' failure to perfect their security interest and because the Tolands consented to the Buttrey sale. Trustee Key Bank asserted that the waiver provision in the Promissory Note did not ex-

tend to the impairment of collateral defense and that Henry's actions were not binding on the Trust.

Following a hearing on the motions, the district court orally ruled on all issues and thereafter filed its summary judgment order. It granted a summary declaratory judgment in favor of Trustee Key Bank on its claim of discharge in the amount of $54,253 for the Tolands' impairment of collateral. Additionally, the district court granted a summary judgment in favor of the Tolands on their guaranty claims against Trustee Key Bank and ordered foreclosure of the building mortgage to satisfy the judgment of $46,505.05.[1] The district court "dismissed" the Tolands' reformation claim, and it also ordered that the Tolands take no additional relief by way of their Third Party Complaint.

Trustee Key Bank promptly paid the entire judgment to the Tolands, rendering foreclosure on the building unnecessary. The Tolands timely appealed from the district court's summary judgment order to raise the issues stated above.

The first issue raised by the Tolands is whether the district court erred by "dismissing" their claim for reformation of the sales documents. While the order stated that the reformation claim was "dismissed," a review of the record reveals that the "dismissal" really constituted a summary judgment in favor of Trustee Key Bank. Consequently, we will address the reformation issue in light of the standard of review applicable to summary judgment orders. As that standard has been often repeated by this Court, we are content to merely refer to the applicable principles in the context of addressing the parties' arguments.

Preliminary to addressing the parties' arguments, it is helpful to review the law as it relates to reformation. Reformation is an equitable remedy which emanates from the maxim that " 'equity treats that as done which ought to have been done.' " 66 AM.JUR.2D *Reformation of In-*

1. The district court arrived at the figure of $46,505.05 by subtracting the discharge amount of $54,253 from the unpaid principal amount of $86,179.52 and by adding $2,574.24 for interest and $12,004.29 for attorney's fees.

*struments* § 2 at 528 (1973). At its most fundamental level, the remedy acknowledges the fact that for one reason or another written instruments do not always accurately memorialize the antecedent agreement of the parties. *See* 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 540 (1960). Accordingly, a court may reform a written instrument upon clear and convincing evidence of the following elements:

"(1) a meeting of the minds—a mutual understanding between the parties—prior to the time a writing is entered into, (2) a written contract or agreement, (3) which does not conform to the understanding, by reason of mutual mistake."

*Gasaway v. Reiter,* 736 P.2d 749, 751 (Wyo. 1987) (quoting *Crompton v. Bruce,* 669 P.2d 930, 934 (Wyo.1983)).

■ The Tolands contend that the district court ignored testimonial and circumstantial evidence which created a genuine issue of material fact regarding whether the parties orally agreed to eliminate by addendum both the security interest and the minimum inventory provisions of the Agreement of Sale of Stock. They assert that such an agreement was reached by the parties' attorneys on account of receiving the guaranty and mortgage from Trustee Key Bank. The Tolands explain that the Security Agreement and Financing Statement was not executed at the closing and that they never perfected a security interest in the Capitol Drug inventory because of this agreement. They argue that reformation is necessary because, through inadvertent omission, the Addendum to Agreement failed to fully express the parties' agreement.

As support for their arguments, the Tolands direct us to the deposition testimony of Joe Toland:

Q. At any point in time between December 11, and December 11, 1987, and January 1, 1988, were there any discussions involving whether or not the Security Agreement would be necessary?

A. Yes, there was.

Q. Who was present during those discussions?

A. Both lawyers.

Q. Being?

A. Being [the Tolands' attorney] and [the Oswalds' attorney].

Q. Were you present?

A. Yes.

Q. Yes. What was said?

A. They agreed that the Security Agreement was not necessary and the Addendum would be made to say that— well, actually Henry didn't want me to have any control of what was going on in the store, that was obvious.

Q. Do you recall the exact date of that meeting?

A. I think it was the 28th of December.

Q. Are you certain of that date, or might it have been a different date?

A. It could have been different.

Q. Why was it decided that the Security Agreement would not be necessary?

A. Because Henry had guaranteed that his son's debts would be paid if he failed to pay it.

The Tolands also direct our attention to the deposition testimony of James Sparks:

Q. Did [Henry Oswald] ask you to negotiate the deal?

A. He asked me which attorneys in town I thought should may[ ]be handle it. He said I didn't need to negotiate it, because Joe had it all set up through his information, that we just needed to protect the Trust and what did I think we needed to do to satisfy Joe's requirements, and to still protect the Trust.

Q. Who did you recommend to him to use as an attorney?

A. I believe I recommended [the Oswalds' attorney].

Q. And did [the Oswalds' attorney], in fact, then represent the Trust?

A. [The Oswalds' attorney] represented, did some of the preliminary work and representation of the Trust, and I believe that [the Tolands' attorney] drafted most of the documents.

Q. Okay. Did anyone other than [the Oswalds' attorney] represent the Trust?

A. I don't think so.

The Tolands argue that the combined effect of this testimony, when coupled with the circumstantial evidence, is sufficient to create a genuine issue of material fact regarding the propriety of reformation. We agree. We believe that the evidence in the record, when viewed in the light most favorable to the Tolands, creates genuine issues of material fact concerning (1) whether the Oswalds' attorney represented both Oswald Jewelry and Trustee Key Bank and, if so, (2) whether he and the Tolands' attorney agreed, on behalf of their clients, to eliminate by addendum both the security interest and minimum inventory interest provisions of the Agreement of Sale of Stock. Should both of these issues be resolved affirmatively, reformation of the written documents and enforcement of the parties' actual agreement would be appropriate. Trustee Key Bank, then, would not be entitled to a partial discharge on the basis of the impairment of collateral defense.

The second issue raised by the Tolands is whether the district court erred by ruling that Trustee Key Bank did not waive in writing the impairment of collateral defense. The Tolands acknowledge that the failure to perfect a security interest may constitute an impairment of collateral. *Shaffer v. Davidson*, 445 P.2d 13 (Wyo. 1968); Wyo.Stat. § 34.1–3–605(g)(1) (1991). They argue, however, that Trustee Key Bank expressly waived all suretyship defenses, including the impairment of collateral defense, when it signed as guarantor of the Promissory Note. The Tolands request this Court to reverse the district court's partial discharge of Trustee Key Bank on this ground, regardless of how the reformation issue is resolved.

The waiver provision of the Promissory Note provided:

The undersigned and endorsers hereof severally waive demand, notice of protest in any defense by reason of extension of time of payment or any other indulgence granted by the holder of this Note.

The Tolands direct our attention to the words "any other indulgence." The es-

sence of their position is that these words are so broad that they effectively waive all suretyship defenses. Trustee Key Bank counters with essentially an *ejusdem generis* argument. It contends that the phrase waives only indulgences related in kind to those already mentioned in the waiver provision. Trustee Key Bank argues that the word "indulgence" is a term of art which means "forbearance."

Waiver of the impairment of collateral defense has been a subject of Wyoming statutory law. The statutory provision in effect at the time of this transaction was Wyo.Stat. § 34–21–373 (1977).[2] Section 34–21–373 provided in relevant part:

(a) The holder discharges any party to the instrument to the extent that without such party's consent the holder:

. . . .

(ii) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

This statutory provision provided no guidance as to what would constitute an effective waiver of or consent to the impairment of collateral defense. Not surprisingly, the Tolands cite case law from jurisdictions which arguably give effect to broad language such as that found in this case. *Chrysler Credit Corporation v. Friendly Ford, Inc.*, 535 S.W.2d 110 (Mo.Ct.App. 1976); *Rhode Island Hospital Trust National Bank v. National Health Foundation*, 119 R.I. 823, 384 A.2d 301 (1978). Trustee Key Bank, on the other hand, cites case law to support its position that a written waiver of the impairment of collateral defense can be accomplished only by "the most unequivocal language in the guaranty contract." *Carrier Brokers, Inc. v. Spanish Trail*, 751 P.2d 258, 262 (Utah Ct.App. 1988). We think that the answer to what constitutes a valid waiver lies somewhere in the balance.

■ In 1991, the Wyoming Legislature revised the Uniform Commercial Code. 1991 Wyo.Sess.Laws ch. 160. As part of

---

**2.** Renumbered as § 34.1–3–606 in 1990.

that revision, Wyo.Stat. § 34.1–3–606 (1990) (formerly § 34–21–373) was repealed and recreated as § 34.1–3–605. Among other things, § 34.1–3–605 addresses in more detail the issue of consent to or waiver of the suretyship defenses. It provides in pertinent part:

(j) A party is not discharged under this section if (1) the party asserting discharge consents to the event or conduct that is the basis of the discharge, or *(2) the instrument or a separate agreement of the party provides for waiver of discharge under this section either specifically or by general 'language indicating that parties waive defenses based on suretyship or impairment of collateral.*

(Emphasis added.) Section 34.1–3–605(j) merely confirms the principle that fair notice is central to the validity of a waiver. As provided, a written waiver, when not specific, must employ language which fairly indicates the general class of actions consented to or defenses waived. Section 34.1–3–605(j).

Examples of adequate waivers can be found in related Wyoming case law. In *Nauman v. CIT Group/Equipment Financing, Inc.*, 816 P.2d 883 (Wyo.1991), this Court held that the guarantor of a promissory note was not discharged from liability by the creditor's election to accept a partial, accelerated payment from the principal in a Chapter 11 bankruptcy proceeding. This holding was premised upon a waiver provision in the guaranty which provided:

"[Creditor] may at any time and from time to time, without our consent, without notice to us and without affecting or impairing the obligation of any of us hereunder, do any of the following: ... (b) accept partial payments of said obli-

gations; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of said obligations and the security therefor in any manner...."

816 P.2d at 885. In *Schauss v. Garner*, 590 P.2d 1316 (Wyo.1979), the Court held that an accommodation party to a promissory note was not discharged from liability by the creditor's return of collateral to the principal. This holding was premised, in part, upon the waiver clause in the promissory note which provided:

"[Creditor] shall be under no obligation to apply to the payment [of this note] any funds or property belonging to any party liable thereon which may at any time be in its possession, and failure to make such application shall not affect the liability of any party hereto...."

590 P.2d at 1318.

Unlike in *Nauman* and *Schauss*, the waiver provision in this case did not give Trustee Key Bank fair notice that it was waiving the action or defense ultimately relied upon as a ground for discharge. The "any other indulgence" language, when read in context, serves only to waive leniencies akin to those already mentioned.[3] We believe that Wyoming law, as well as the dictates of fair practice, require more than what was done in this case to effectuate a valid waiver of the impairment of collateral defense.[4]

As an adjunct to their second issue, the Tolands argue that Trustee Key Bank impliedly consented to the impairment of collateral because alleged de facto trustee, Henry Oswald, induced the Tolands to consent to the Buttrey sale. The district court reasoned that the Tolands' consent to the Buttrey sale was immaterial because First Interstate Bank already had a first priority

3. The waiver provision in the Guarantee provided:

The undersigned waives notice of non-payment, protest, and notice of protest with respect to the obligations covered by said Agreement and said Note.

4. For an interesting comparison, *see Flying J, Inc. v. Booth*, 773 P.2d 144 (Wyo.1989); *Security State Bank of Basin v. Newton*, 707 P.2d 173

(Wyo.1985); *McKenzie v. Neale Construction Company*, 75 Wyo. 175, 294 P.2d 355 (1956); and *Blyth v. Pinkerton*, 10 Wyo. 135, 67 P. 619 (1902). In these cases, the Court stated that a guarantor's liability will not be expanded beyond the express terms of the guaranty by construction or implication. As a necessary caveat, the Court warned creditors to express their intentions concerning the scope of a guaranty with clarity.

security interest in the Capitol Drug inventory.

We agree with the district court's assessment. First Interstate Bank was staged to receive the proceeds from the Capitol Drug inventory whether it was sold to Buttrey or disposed of in some other fashion. Accordingly, we believe that the present dispute over the discharge amount of $54,253 should be resolved by the reformation issue. If the Tolands were not required to perfect a security interest in the Capitol Drug inventory, then Trustee Key Bank should not be entitled to a discharge for the Tolands' failure to do so. If the converse is true, then Trustee Key Bank's discharge should stand.

The third issue raised by the Tolands concerns their damages claim for Trustee Key Bank's failure to provide rent-free space in which to operate their liquor store following Oswald Jewelry's default. This claim is premised primarily upon the following clause of the Guarantee:

> Further, the undersigned guarantees that the undersigned shall make available to Joe H. Toland in the said building at 129 North Main Street, that number of square feet presently occupied by him in the operation of his liquor store business. This space shall be rent-free.

Trustee Key Bank argues that this claim should not lie for various reasons, including impossibility of performance and violation of the rule against perpetuities.

The record indicates that the liquor store damages claim was presented and defended against at the summary judgment stage of this case. The district court, however, did not rule on the claim. As this Court is a court of review, except in limited circumstances not applicable to this case, we decline to address the merits of the liquor store damages claim until it has been passed upon at the district court level. *See Buckman v. United Mine Workers of America*, 80 Wyo. 199, 339 P.2d 398 (1959).

The fourth and last issue raised by the Tolands concerns whether they are to receive attorney's fees for this appeal and any further proceedings. We discern no present need to decide this issue. As this case is being reversed and remanded, any claims for attorney's fees may be presented to the district court at the conclusion of the proceedings.

Reversed and remanded for proceedings consistent with this opinion.